JOSEPH N. AKROTIRIANAKIS (Bar No. 197971)
*jakro@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: 213-443-4355
Facsimile: 213-443-4310

CHRISTOPHER C. CAMPBELL (*pro hac vice* to be filed)
*ccampbell@kslaw.com*
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006-4707
Telephone: 202-626-5578
Facsimile: 202-626-3737

BRITTON F. DAVIS (*pro hac vice* to be filed)
*bfdavis@kslaw.com*
ANGELA C. TARASI (*pro hac vice* to be filed)
*atarasi@kslaw.com*
MIKAELA STONE (*pro hac vice* to be filed)
*mikaela.stone@kslaw.com*
KING & SPALDING LLP
1515 Wynkoop St., Suite 800
Denver, CO 80202
Telephone: 720-535-2300
Facsimile: 720-535-2400

Attorneys for Plaintiff OPEN TEXT CORPORATION

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| OPEN TEXT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>HYLAND SOFTWARE, INC.,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR PATENT INFRINGEMENT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Open Text Corporation ("OpenText Corporation") alleges against Defendant Hyland Software, Inc. ("Hyland" or "Defendant") as follows:

1. OpenText Corporation provides information management solutions that allow companies to organize and manage content, operate more efficiently, increase engagement with customers, collaborate with business partners, and address regulatory and business requirements.

2. OpenText Corporation provides such solutions by distributing software products and providing customer support and professional services through a number of subsidiaries, including Open Text, Inc., which sells OpenText software and services in the United States.

3. The OpenText family of companies (collectively "OpenText") has approximately 15,000 employees, more than 74,000 customers, and over $3.11 billion in annual revenues. OpenText invested approximately $1 billion on research and development over the three years ending June 30, 2020.

4. OpenText is a leading provider of Enterprise Content Management ("ECM") products, which refer to a variety of solutions for managing business content. One such solution provides a repository for electronic documents (such as those created via Microsoft Office, Computer-Aided Design, or Portable Document Format) and allows for functions such as organization, display, classification, access and version control, event auditing, rendition, and search. ECM also includes software tools and services for collaboration, records and email management, and archiving.

5. OpenText's ECM provides the foundation for its offerings in a broader market category known as Enterprise Information Management ("EIM"). EIM encompasses capabilities such as Business Process Management ("BPM"), Customer Experience Management ("CEM"), Information Exchange ("IE"), and Discovery. OpenText offers a range of software products and services in each of these areas, including Documentum. OpenText's technologies have become critical to organizations looking for efficient content management options.

6.     Gartner's Magic Quadrant report for 2019, published October 30, 2019, named OpenText a "Leader" in Content Services Platforms. And Gartner's 2019 Market Share Analysis, published July 24, 2020, ranked OpenText one of the "Top Five Content Services Providers, Worldwide" in 2019; in particular, OpenText was ranked first for "Content Services Platforms."

7.     OpenText currently maintains three offices in the State of California, one of which is located in this judicial district, including the Pasadena office at 1055 E. Colorado Blvd., Pasadena, California 91106-2375. Over 187 employees work in OpenText's Pasadena office, including employees in engineering, marketing, strategic development, and public relations.

8.     OpenText tracks its business through four revenue streams: license, customer support, cloud services, and professional services. OpenText receives license revenue from its software products; customer support revenue from renewable support and maintenance OpenText provides to customers who have purchased its products; cloud services revenue from certain "managed hosting" services arrangements; and professional services revenue from consulting fees OpenText collects for providing implementation, training, and integration services related to OpenText's product offerings.

9.     Hyland Software, Inc. provides an EIM platform called OnBase, in the form of content management services which can be accessed by computers or mobile devices.

10.    Hyland's OnBase platform includes, without limitation, capabilities for ECM, case management, BPM, records management, records capture (e.g., Brainware), enterprise search, and Enterprise file sync and share (EFSS).

11.    Hyland competes directly with OpenText in the ECM and EIM markets by its manufacture, use, sale, and offer for sale of Hyland's OnBase platform and integrated applications, which infringe OpenText's intellectual property rights.

12. OpenText brings this lawsuit to protect its intellectual property investments and to hold Hyland accountable for its infringement. As a result of Hyland's unlawful competition in this judicial district and elsewhere in the United States, OpenText has lost sales and profits and suffered irreparable harm, including lost market share and goodwill.

## NATURE OF THE CASE

13. Plaintiff brings claims under the patent laws of the United States, 35 U.S.C. § 1, *et seq.*, for the infringement of United States Patent No. 7,627,726; No. 7,370,059; No. 8,712,980, No. 8,724,907 (collectively, the "Patents-in-Suit").

## THE PARTIES

14. Plaintiff OpenText Corporation, is a Canadian corporation with its principal place of business at 275 Frank Tompa Drive, Waterloo, Ontario, Canada.

15. Defendant Hyland Software, Inc. is a corporation with its global headquarters at 28500 Clemens Road, Westlake, Ohio 44145, with multiple other offices within the U.S. and elsewhere, including an office in this District in Irvine California, at 2355 Main Street, Suite 100, Irvine, CA 92614.

## JURISDICTION & VENUE

16. This action arises under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.* The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

17. This Court has personal jurisdiction over Hyland because it regularly conducts business in the State of California and in this district, including operating systems and/or providing services in California and in this district that infringe one or more claims of the Patents-in-Suit in this forum. Hyland has, either directly or through intermediaries, purposefully and voluntarily placed its infringing product and/or services into the stream of commerce with the intention and expectation that they will be purchased and used by customers in this District, as detailed below.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. § 1400(b) because, upon information and belief, Hyland regularly conducts business within this District, has a regular and established place of business in this District, and has committed acts of infringement within this District. In addition, on information and belief, as a foreign corporation with sufficient contacts with this District, venue is proper against Hyland in this District.

19.     Hyland Software, Inc. is a registered business in California. (Exhibit 1.)

20.     On information and belief, Hyland has a regular and established place of business at 2355 Main Street, Suite 100, Irvine, California 92614. (Exhibit 2.)

21.     On information and belief, Hyland has employees in this district, including at least 60 employees at Hyland's Irvine, California location.

22.     Hyland sells and/or offers for sale its infringing EIM through its websites - https://www.hyland.com/en/platform/product-suite and https://www.onbase.com/en - which may be accessed by customers within this district.

23.     On information and belief, Hyland sells and/or offers for sale infringing EIM to customers located in this district, including, for example, California State Polytechnic University, Pomona, located at 3801 West Temple Ave., Pomona, California 91768 (Exhibit 3; Exhibit 4.)

24.     As further detailed below, Hyland's use, provision of, offer for sale, sales, and advertising of its EIM platform within this judicial district infringe the Patents-in-Suit. Hyland's customers infringe the Patents-in-Suit by using Hyland's EIM platform within this judicial district.

25.     Because Hyland actively targets customers served by OpenText and the OpenText office in Pasadena, California, Hyland's infringement adversely impacts the over 187 OpenText employees who live and work in and around this judicial district.

/ /

/ /

/ /

**THE PATENTS-IN-SUIT**

U.S. Patent No. 7,627,726

26.    U.S. Patent No. 7,627,726 ("the '726 patent"), entitled "Systems and Methods for Managing Content Having A Retention Period on a Content Addressable Storage System," was duly and legally issued on December 1, 2009. A true and correct copy of the '726 patent is attached as Exhibit A.

27.    The '726 patent is generally directed to an improvement to the operation of computer data storage systems and methods for storing content and its associated metadata in accordance with a retention policy. The '726 patent discloses and specifically claims inventive and patentable subject matter that represents significant improvements over conventional ECMs that were available at the time of filing of the '726 patent and are more than just generic apparatus or software components performing conventional activities.

28.    "Enterprise content exists in many forms, such as text documents, spreadsheets, images, e-mail messages, and fixed content such as schematics, records, and scanned images." ('726 patent, 1:20-22.) At the time of filing of the '726 patent, compliance regulations and the need to access and supply files and records in electronic form using ECM systems motivated many companies to use "content management systems which employ storage servers for storing and archiving content." ('726 patent, 1:36-39.) "These content management systems allow for much more flexibility than traditional localized storage," allowing for relationships between content to be established, publication of content through multiple channels, or remote access of content. ('726 patent, 1:39-47.) But these multiple storage server systems had downsides as a function of their distributed nature. For example, these systems were more vulnerable to employees or hackers stealing and/or destroying content, located using the file path. ('726 patent, 1:48-55.) As a solution, some systems chose to store content on write once, read many ("WORM") devices, in order to prevent easy destruction of the content by employees or hackers. ('726 patent, 1:48-57.) When using

this type of storage, however, "if it is no longer necessary to store content, the only way to destroy the content is to literally break the optical platter that is typically used for WORM storage." ('726 patent, 1:57-60.) Prior art to the '726 patent thus proposed the use of content addressable storage, in which the system relies on a content address for describing the physical location of the content, instead of file paths. ('726 patent, 1:61-65.) The content address identified not only where the content was stored, but also other properties of the content called metadata, such as the content name, date created, date last accessed, author, permissions, etc. ('726 patent, 2:1-6.) "By storing the metadata along with the content, it is easy to verify the content, and determine other properties of the content simply by accessing the metadata." ('726 patent, 2:11-14.) A persistent disadvantage of these prior art ECM systems, however, "is that there [was] no method for managing the retention of the content or metadata," that could be enforced by the system itself and thus preventing employees or hackers from circumventing it. ('726 patent, 2:18-22.)

29.    The '726 patent's claimed system/method for storing content having a retention period solves this content management problem by reciting specific and significant improvements over the conventional ECM method/system, such as, for example, allowing an administrator to set certain properties, or metadata, of the content—including a retention policy—which will persist with the content when it is stored. ('726 patent, 2:23-27.) This retention policy defines a point in time after which the content and all associated metadata may be deleted from the storage system, which can then be enforced by the system itself. ('726 patent, 2:30-33.) The '726 patent also provides methods for enforcing which storage system is used based on the object type, such that documents of certain types can be directed to certain data storage facilities. ('726 patent, 5:11-17.) This is important for compliance purposes as, in many cases, certain types of data must be stored within certain jurisdictions, while others do not, and many distributed storage systems have distributed storage policies that can cross borders and jurisdictional boundaries. Without these protections enforceable by the

1    system, documents could be stolen, destroyed, or stored in improper locations that

2    violate data governance regulations.

3         30.    The '726 patent's claimed method is achieved by using a "storage object"

4    and "plugin library" configured to pass the user-defined metadata, including the

5    retention period, and the content to the storage system. ('726 patent, 2:35-38.) "The

6    storage object and plugin library are configured to interface with a particular type of

7    storage system, such that when a content management server identifies a storage object

8    associated with a particular storage system, it loads the appropriate plugin library for

9    passing the content and metadata to the particular storage system." ('726 patent, 2:38-

10   42.) Each claim of the '726 patent is directed to these specific improvements in the

11   capabilities of ECM systems and not to an abstract process that merely invokes these

12   devices as tools.

13        31.    Given the state of the art at the time of filing of the '726 patent, the claim

14   limitations of the '726 patent, both individually and as an ordered combination, were

15   not conventional, well understood, or routine. The '726 patent discloses, among other

16   things, an unconventional technological solution to an issue arising specifically in the

17   context of ECM systems using distributed server and storage system architectures. The

18   solution implemented by the '726 patent provides a specific and substantial

19   improvement over prior ECM systems, including by introducing novel elements

20   combined in an unconventional manner directed to improving the function and working

21   of ECM systems such as the claimed "creating a content object for the content . . .

22   defining object properties for the content . . . wherein:  . . . the content management

23   server transmits the content and object properties to the selected storage system through

24   the determined plugin, wherein the determined plugin comprises specific application

25   program interfaces to the selected storage system, configured to allow the object

26   properties to be set including the retention period to be defined." ('726 patent, cl. 1.) As

27   discussed above, these claimed elements and their combination were not present in the

28   prior art, and represent unconventional and concrete improvements over the prior art.

32.     Consistent with the problem identified by the '726 patent being rooted in ECM systems and associated multiple distributed storage systems, the '726 patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind. This technical context is reflected in the '726 patent's claims, as described above. A person having ordinary skill in the art at the time of the invention of the '726 patent would not have understood that the invention could or would be performed solely in the human mind or using pen and paper. Using pen and paper would ignore the stated purpose of the '726 patent and the problem the patented technology was specifically designed to address—allowing the ECM system with distributed storage, servers, and access to enforce regulatory controls on the data within its systems. Doing so would also run counter to the inventors' detailed description of the inventions, and the language of the claims, and be a practical impossibility.

<u>U.S. Patent No. 7,370,059</u>

33.     U.S. Patent No. 7,370,059 ("the '059 patent"), entitled "Model of Documents and Method for Automatically Classifying a Document," was duly and legally issued on May 6, 2008. A true and correct copy of the '059 patent is attached as Exhibit B.

34.     The '059 patent is generally directed to a system and method for creating a model of documents representing a class of documents. The '059 patent discloses and specifically claims inventive and patentable subject matter that represents significant improvements over conventional EIM platforms that were available at the time of filing of the '059 patent and is more than just generic apparatus or software components performing conventional activities.

35.     At the time of the filing of the Patents-in-Suit, "enterprise content exist[ed] in many forms, such as text documents, spreadsheets, images, e-mail messages, and fixed content such as schematics, records, and scanned images." ('726 patent, 1:20-22.) Documents were digitalized into "document images" by a variety of means for storage in an enterprise content management system. (*See* '059 patent, 1:7-10.) "In various

applications, it is desirable to classify documents by their type, e.g., business letters, invoice, fax cover sheet, and by their origin, e.g., customer, subscriber, etc." ('059 patent, 1:11-13.) A "class" refers to "a set of documents of a given type," in which each document may include a similar structure or content. ('059 patent, 1:15-19.) The prior art included a variety of automatic classification techniques. For example, one method included applying a pattern or optical character recognition (OCR) to a portion or all of the document to segment the document into blocks of data. ('059 patent, 1:23-26.) A vector of characteristics is created to represent the segment or document and a classification algorithm is then applied to the vector to determine in which class the document belongs. ('059 patent, 1:26-30.) Other methods "perform document classification further to a learning step" in which a model is created to represent a class of documents. ('059 patent, 1:35-39.) But "[s]uch models of documents are commonly created by an operator and such supervised operation is time consuming and expensive." ('059 patent, 1:39-41.) Furthermore, "automatic classification of document images requires high processing capacity." ('059 patent, 1:33-34.)

36.    The '059 patent's claimed system/method for automatically creating a model of documents solves this problem by reciting specific and significant improvements over the conventional content management method/system, such as "determining at least one potential identifying tag within the first document, said identifying tag being defined by at least a graphical content, a size and a location within the first document," "correlating the at least one potential identifying tag within the first document with at least one potential identifying tag from a second document," "and creating a model of documents related to the first class, wherein the model includes the at least one potential identifying tag." ('059 patent, cl. 1.) For example, the specification discloses construction of a model based on a "correlation" between identifying tags in documents of the same class. ('059 patent, cl. 1.) The correlation is calculated based on "pixel data" within the tags, which is inherently related to computer technology. ('059 patent, 5:21-30.) For example, an exemplary embodiment of the claimed invention

calculates the correlation using a working window, which in turn is determined based on an "object to surface ratio." ('059 patent, cl. 1.) The object to surface ratio is calculated also based on the pixel data within the tentative working window. ('059 patent, 4:49-55.) The document model is based on, includes, or represents this correlation. ('059 patent, 6:11-17.)

37.    The claims of the '059 patent are directed to specific improvements in the capabilities of content management and content information systems and applications, not to an abstract process that merely invokes these devices as tools.

38.    Given the state of the art at the time of filing of the '059 patent, the claim limitations of the '059 patent, both individually and as an ordered combination, were not conventional, well understood, or routine. For example, the claimed solution takes advantage of the *digital nature* of the digitized documents and overcomes the challenges in traditional methods, including high processing capacity requirements, high expense, and excessive time requirements. The solution of the '059 patent allows computers to realize document classification with less processing capacity, less cost, and less time, thereby improving the functionality of computers. ('059 patent, 6:53-57, 7:58-63.)

39.    The '059 patent discloses, among other things, unconventional technological solutions to issues arising specifically in the context of electronic document processing and automated classification. The solution implemented by the '059 patent provides a specific and substantial improvements over prior content management systems, including by introducing novel elements combined in an unconventional manner directed to improving the function and working of electronic devices such as—but not limited to--the claimed "correlating the at least one potential identifying tag within the first document with at least one potential identifying tag from a second document of the same first class" and "creating a model of documents related to the first class, wherein the model includes the at least one potential identifying tag within the first document having a correlation that is representative of the first class." ('059 patent, cl. 1.) As discussed above, these claimed elements and their combination

1   were not present in the prior art, and represent unconventional and concrete
2   improvements to the operation of ECM and EIM systems over the prior art.

3       40.   Consistent with the problem identified by the '059 patent being rooted in
4   content management and information systems, the '059 patent's solutions are also
5   rooted in the same technology that cannot be performed with pen and paper or in the
6   human mind. This technical context is reflected in the '059 patent's claims, as described
7   above.

8       41.   A person having ordinary skill in the art at the time of the invention of the
9   '059 patent would not have understood that the invention could or would be performed
10  solely in the human mind or using pen and paper. Using pen and paper would ignore
11  the stated purpose of the '059 patent and the problem the patented technology was
12  specifically designed to address. Doing so would also run counter to the inventors'
13  detailed description of the inventions, and the language of the claims, and be a practical
14  impossibility.

15              <u>U.S. Patent No. 8,712,980</u>

16      42.   U.S. Patent No. 8,712,980 ("the '980 patent"), entitled "Consistent
17  Retention and Disposition of Managed Content and Associated Metadata," was duly
18  and legally issued on April 29, 2014. A true and correct copy of the '980 patent is
19  attached as Exhibit C.

20      43.   The '980 patent is generally directed to a system and method for
21  consistently retaining and disposing of managed content and the associated metadata
22  alike. The '980 patent discloses and specifically claims inventive and patentable subject
23  matter that represents significant improvements over conventional ECM systems that
24  were available at the time of filing of the '980 patent and is more than just generic
25  apparatus or software components performing conventional activities.

26      44.   At the time of filing of the '980 patent, and as discussed above,
27  applications or platforms, such as ECM systems, were being used to preserve and
28  dispose of files and records. ('980 patent, 1:17-24.) "[I]n a typical managed content

system each item of stored content, e.g., each file or other file system object, etc., has associated with it metadata used to track, locate, control and manage access to, and/or provide one or more other content management functions with respect to the corresponding content item." ('980 patent, 1:30-35.) As discussed above, in connection with the '726 patent, an enterprise or other content owner may be required and/or may desire to enforce retention policies or other requirements to the underlying content item. ('980 patent, 1:35-40.) However, at the time of the filing of the '980 patent, there was "a need for a way to ensure that items of content and their associated metadata are retained and disposed of in parallel." ('980 patent, 1:41-43.)

45.     The '980 patent's claimed system/method for consistent retention and disposition of managed content and associated metadata solves this problem by reciting specific and significant improvements over the conventional content management method/system, such as storing the content item in "a content store" and automatically retaining the associated metadata "in parallel in accordance with the retention policy, wherein the associated metadata is stored in a metadata store"; in other words, for example, separating the metadata and its storage from the storage of the object it is associated with. ('980 patent, cl. 1.) A dependent claim discloses configuring the metadata into one or more of "a content object, a document object, and a retainer object" to facilitate the selective application of a retention policy in parallel. ('980 patent, cl. 7, FIGs. 5A-5D.) The claims of the '980 patent are directed to these specific improvements in the capabilities of content management systems and applications, not to an abstract process that merely invokes these devices as tools.

46.     Given the state of the art at the time of filing of the '980 patent, the claim limitations of the '980 patent, both individually and as an ordered combination, were not conventional, well understood, or routine.

47.     The '980 patent discloses, among other things, unconventional technological solutions to an issue arising specifically in the context of managing content and associated metadata governed by a retention policy in ECM systems.

48.     The solution implemented by the '980 patent provides a specific and substantial improvement over prior content management systems, including by introducing novel elements combined in an unconventional manner directed to improving the function and working of electronic devices such as the claimed "content [ ] stored in a content store; and automatically retaining the selected item of content and its associated metadata in parallel in accordance with the retention policy, wherein the associated metadata is stored in a metadata store . . . applying the retention policy both to the selected item of content and to its associated metadata." ('980 patent, cl. 1.) As discussed above, these claimed elements and their combination were not present in the prior art, and represent unconventional and concrete improvements over the prior art.

49.     Consistent with the problem identified by the '980 patent being rooted in content management systems, the '980 patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind. This technical context is reflected in the '980 patent's claims, as described above.

50.     A person having ordinary skill in the art at the time of the invention of the '980 patent would not have understood that the invention could or would be performed solely in the human mind or using pen and paper. Using pen and paper would ignore the stated purpose of the '980 patent and the problem the patented technology was specifically designed to address. Doing so would also run counter to the inventors' detailed description of the inventions, and the language of the claims, and be a practical impossibility.

/ /

/ /

## U.S. Patent No. 8,724,907

51.     U.S. Patent No. 8,724,907 ("the '907 patent"), entitled "Method and System for Using OCR Data for Grouping and Classifying Documents," was duly and legally issued on May 13, 2014. A true and correct copy of the '907 patent is attached as Exhibit D.

52.     The '907 patent is generally directed to a system and method for using optical character recognition (OCR) data for identifying word pairs in documents to be classified. The '907 patent discloses and specifically claims inventive and patentable subject matter that represents significant improvements over conventional EIM platforms that were available at the time of filing of the '907 patent and is more than just generic apparatus or software components performing conventional activities.

53.     At the time of the filing of the Patents-in-Suit, "enterprise content exist[ed] in many forms, such as text documents, spreadsheets, images, e-mail messages, and fixed content such as schematics, records, and scanned images." ('726 patent, 1:20-22.) "Transforming the information into intelligent content can feed enterprise applications such as enterprise content management, enterprise resource planning, customer relationship management, and other information systems." ('907 patent, 1:20-24.) "In various applications, it is desirable to classify documents by their type, e.g., business letters, invoice, fax cover sheet, and by their origin, e.g., customer, subscriber, etc." ('059 patent, 1:11-13; '907 patent, 1:19-20.) "A key to utilizing information successfully is the ability to efficiently capture and manage large volumes of information from disparate sources." ('907 patent, 1:17-19.) But "[i]t can be very difficult to group and classify paper documents that have been scanned because of optical character recognition (OCR) errors, differences in text, differences in graphics, noise, stray marks, rotations, skewing, handwriting, and so forth." ('907 patent, 1:25-29.) Due to the "sheer volume and complexity alone, it can thwart productivity, waste time and resources, and strain the IT infrastructure that supports it." ('907 patent, 1:14-16.)

54.     The '907 patent's claimed system/method for using OCR data to pair keywords in documents to be classified solves these problems by reciting specific and significant improvements over the conventional content management method/system, by comparing "a first area value" associated with keywords in a template and "a second area value" associated with keywords in the digitized document. ('907 patent, cl. 1.)

For example, the specification discloses area values that are inherently computer-related because they can be quantified by the number of digital pixels related to the keywords. The specification explains that the "spatial relations of the template keywords. . . are compared with the spatial relations of corresponding words in the document" to be classified. ('907 patent, Abstract.)

55.     As another example, an exemplary embodiment of the claimed invention realizes the determination of word pairs in digitized documents by calculating and comparing the Levenshtein distances between a keyword from the template and a keyword from the digitized document. ('907 patent, cl. 7.)

56.     The claims of the '907 patent are directed to specific improvements in the capabilities of content management and content information systems and applications, not to an abstract process that merely invokes these devices as tools.

57.     Given the state of the art at the time of filing of the '907 patent, the claim limitations of the '907 patent, both individually and as an ordered combination, were not conventional, well understood, or routine. For example, the claimed solutions take advantage of the *digital nature* of the digitized documents to realize more efficient document classification by analyzing area values underlying keywords in the digitized documents, rather than comparing the content of the keywords, thereby improving the functionality of computers.

58.     The '907 patent discloses, among other things, unconventional technological solutions to issues arising specifically in the context of digital document classification and management. The solution implemented by the '907 patent provides a specific and substantial improvements over prior document classification, including by introducing novel elements combined in an unconventional manner directed to improving the function and working of electronic devices such as the claimed comparison of "the first and second area values" and "determin[ing] that a difference between the first and second area values is below a threshold value." ('907 patent, cl. 1.) As discussed above, these claimed elements and their combination were not present

in the prior art, and represent unconventional and concrete improvements to the operation of ECM and EIM systems over the prior art.

59.    Consistent with the problem identified by the '907 patent being rooted in content management and information systems, the '907 patent's solutions are also rooted in the same technology that cannot be performed with pen and paper or in the human mind. This technical context is reflected in the '907 patent's claims, as described above.

60.    A person having ordinary skill in the art at the time of the invention of the '907 patent would not have understood that the invention could or would be performed solely in the human mind or using pen and paper. Using pen and paper would ignore the stated purpose of the '907 patent and the problem the patented technology was specifically designed to address. Doing so would also run counter to the inventors' detailed description of the inventions, and the language of the claims, and be a practical impossibility.

61.    Open Text Corporation is the holder of all right, title, and interest in the '726, '059, '980, and '907 patents (collectively, the "Patents-in-Suit"), including all rights to collect damages throughout the period of Defendant's infringing acts, *all* rights to prevent others from making, having made, using, offering for sale, or selling products or services covered by such patents, and all rights to enforce the Patents-in-Suit.

Documentum

62.    The '726 and '980 patents cover aspects of OpenText's ECM software, including features of Documentum. OpenText marks its products with the Patents-in-Suit. (Exhibit 5.) Documentum, which was owned by EMC around the time of the priority date of the Patents-in-Suit (Exhibit 6), received numerous accolades relating to metadata, data storage, and compliance features covered by certain of the Patents-in-Suit, further supporting that the Patents-in-Suit implement unconventional technological solutions to issues arising specifically in the context of electronic content management applications and systems. For example, "EMC Documentum ECI Services

addresses the most time-consuming problems that employees face each day finding, gathering, and sharing needed information, when it is stored in multiple formats, locations, and languages. . . . Documentum ECI Services can significantly boost employee productivity by streamlining lengthy research and delivering information in a consistent, organized format, making it a powerful tool for global information discovery and knowledge sharing." (Exhibit 7.) "The Documentum platform provided built-in security, versioning, workflow and lifecycle management, from creation to archiving, of all types of unstructured content across the enterprise." (Exhibit 8.) Using the Documentum ECM platform, with content archiving and retrieval solutions, "organisations can capture, manage, store, archive and ultimately dispose of all types of content . . . while making it readily available, secure and re-usable." (Exhibit 9.) "Global firms rely on Documentum, EMC for solutions that enable compliance." (Exhibit 9.)

<u>Captiva</u>

63.    The '059 and '907 patents cover aspects of OpenText's ECM software, including features of its Intelligent Capture, formerly OpenText Captiva. OpenText marks its products with the Patents-in-Suit. (Exhibit 5.) Captiva, which was owned by EMC around the time of the priority date of the Patents-in-Suit, received numerous accolades relating to data capture covered by certain of the Patents-in-Suit, further supporting that the Patents-in-Suit implement unconventional technological solutions to issues arising specifically in the context of electronic content management applications and systems. For example, "strong third party adoption" of Captiva by both hardware manufacturers and software developers was reported in July 2012. (Exhibit 10; *see, e.g.*, Exhibit 11; Exhibit 12.) Companies touted the fact that Captiva "eliminates limitations such as browser compatibility and the need for plug-ins, thereby simplifying the development process." (Exhibit 12.) "The main value add of the toolkit is that it reduces the cost of supporting distributed capture applications as it simplifies the development process and supports a wide range of platforms."  (Exhibit 12.) "EMC

Captiva [ ] established its leadership in document capture by providing both enterprise-class document capture solutions to customers and delivering capture technology for partners to extend. With the Captiva Cloud Toolkit, we are providing the best developer experience for adding distributed scanning capabilities to business applications." (Exhibit 10.) Then Vice-President of Ricoh Americas Corporation reported that "with this new Captiva Cloud Toolkit we take a major next step. . . . In adding web-based scanning to Ricoh's cloud-based document management service, DocumentMall, built on Documentum, we can offer substantial new value to our customers." (Exhibit 10.)

## ACCUSED PRODUCTS

64.   Hyland's OnBase Enterprise Information Management (EIM) Software and Perceptive Content Management (ECM) Software ("the Accused Products") provide platforms for enterprises and their users to store, manage, capture, and access content.

65.   The Accused Products include, without limitation, Hyland's OnBase platform and integrated applications, wherein OnBase may operate at least in hybrid, cloud, on-premise, or mobile device environments.

66.   The Accused Products also include, without limitation, Hyland's Perceptive Content platform and integrated applications, wherein Perceptive Content may operate at least in on-premise or mobile device environments.

67.   The Accused Products further include integrations for its EIM and ECM software platforms, including, without limitation, Brainware data capture tools, such as Hyland's Advanced Capture.

68.   On information and belief, each of these implementations, whether accessed via computer or mobile device, operate similarly for purposes of determining infringement.

## FIRST CAUSE OF ACTION
### (INFRINGEMENT OF THE '726 PATENT)

69.     OpenText realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

70.     Hyland has infringed and continues to infringe one or more claims of the '726 patent in violation of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States and will continue to do so unless enjoined by this Court. Hyland directly infringes at least claim 1 of the '726 patent by making, using, selling, and/or offering to sell at least the accused OnBase EIM platform and integrated applications.

71.     For example, claim 1 of the '726 patent recites:

1. A method for storing content with retention management properties on at least one of a plurality of storage systems, the method comprising:

creating a content object for the content;

defining an object type for the content object, the object type defining how the content will be stored, and on which of the plurality of storage systems the content will be stored;

defining object properties for the content;

transmitting the content object, including the content and the object properties, to a content management server, wherein:

the content management server selects at least one storage system from the plurality of storage systems on which to store the content object based on the content object type;

the content management server associates the object properties, including a retention period, with the content;

the content management server determines a plugin configured to communicate with the selected storage system;

the content management server transmits the content and object properties to the selected storage system through the determined plugin, wherein the determined plugin comprises specific application program interfaces to the selected storage system, configured to allow the object

properties to be set including the retention period to be defined, such that they are stored on the selected storage system; and

the content management server stores the object properties including the retention period in a relational database.

72.     Hyland encourages customers to use its OnBase Software in a way that infringes each limitation of at least claim 1 of the '726 patent at least by selling and offering to sell the infringing software, making its content services available on its website, providing applications that allow users to access those services, widely advertising those services, and providing technical support and instructions to users.

73.     To the extent the preamble is construed to be limiting, Hyland's OnBase software provides a method for storing documents ("content") with retention management properties. As documents enter OnBase, they are automatically organized into a folder structure including one or more folders ("plurality of storage systems") and assigned unique retention requirements.



1

COMPLAINT FOR PATENT INFRINGEMENT

1
2
3
4
5
6
7
8
9
10
11
12



13 (*See* https://www.onbase.com/en/product/platform-capabilities/enterprise-content-management/onbase-ecm-functionality/records-management)

14
15
16



17
18
19
20
21
22 (*See* https://training.hyland.com/courses/P1710-Folders-and-File-Cabinets-Hands-On-Lab)

23       74.    Hyland's OnBase software also offers a variety of file archiving and
24 storage solutions:
25
26
27
28

Enhance your document archiving solution with OnBase document archiving and file storage software

OnBase offers a variety of file archiving and storage solutions, including:

- **EMC Centera:** The OnBase Integration for EMC Centera uses built-in redundancy to ensure document availability, reduces the time spent creating back-ups and retains content stored in Centera according to OnBase retention schedules
- **IBM Tivoli:** The OnBase Integration for IBM Tivoli allows users to store OnBase documents on media controlled by an IBM Tivoli storage manager, eliminating the need to install Tivoli on every workstation and easily archiving a variety of media types and copies for off-site storage
- **Document transfer:** OnBase allows data and content to be shared and/or replicated between two or more independent OnBase systems. This equips users to interact with information across distributed organizational structures and geographies.
- **CD/DVD/Blu-ray authoring and export**: OnBase integrates with a Rimage unit to allow automatic, unattended backup of document files from any OnBase disk group volume onto a CD or DVD media. These discs can then be stored off-site and used to restore documents in the event of data loss.

(*See* https://www.onbase.com/en/product/platform-capabilities/enterprise-content-management/onbase-ecm-functionality/records-management/file-storage-and-archiving)

75.    Hyland's OnBase software provides a method creating a content object for the content to be stored. When documents are imported into OnBase, they are automatically declared as records.





COMPLAINT FOR PATENT INFRINGEMENT

(*See* https://www.onbase.com/en/product/platform-capabilities/enterprise-content-management/onbase-ecm-functionality/records-management)

76.    Hyland's OnBase software provides a method defining an object type for the content object, the object type defining how the content will be stored, and on which of the plurality of storage systems the content will be stored. For example, a user of OnBase Software can specify the "Document Type" out of a plurality of options when importing a document into the OnBase database. The selected Document Type can determine where the imported document is stored.



(*See* https://www.youtube.com/watch?v=9lXTgjAsiWc, at 0:36)



(*See* https://www.youtube.com/watch?v=9lXTgjAsiWc, at 0:46)



(*See* https://www.youtube.com/watch?v=9lXTgjAsiWc, at 2:13)

77.   Hyland's OnBase software provides a method for defining object properties for the content. For example, Hyland's OnBase software can capture the index information associated with an imported document. A user can also specify the "File Type" and "Document Date" of an imported document.

## Getting meta about metadata: Connecting content to business transactions, part 1

BY ERIC PROEGLER · 08/20/2010

When we think about keeping track of information, we usually start with when we save or capture it. We capture data all the time, such as when we upload photos of kids, a vacation view, a restaurant dish we tried, or some other reason for bragging on Facebook.

To find a particular photo, our mental database uses information about what we're looking for. We can then skim thumbnails for the tiny green soccer jersey, white sandy beach, or monstrous bacon cheeseburger that we remember from the picture we're trying to find.

At work, there are way too many documents, or too much content, to rely on manual scans supported by mental hints. We need more. To capture, preserve, and protect the content we care about, we can store it in an enterprise content management (ECM) solution. Capturing and storing content is where ECM starts.

However, the real value provided by ECM isn't from storing the content; the value is provided by the ability to quickly and easily retrieve exactly the content you need. Usually, the first sorting of content is into content types, such as invoices. This creates a bucket of content that looks even more alike, though.

To find specific invoices, we need to capture more than just the content; we also need to capture index information that helps identify the content. This metadata, or data about data, is how ECM allows users to search for the content they need.

Some types of content have just a few things worth indexing. Other types of content have many attributes that could be useful to store. Different people in different roles have different reasons to find and use the same content. This means they are likely to use different types of metadata to locate the content they need.

When the ECM solution allows capture of all the useful metadata for an invoice, all of the ECM systems' users can find the content they are looking for, with the information they use in their roles.

24

(*See* https://blog.hyland.com/hyland-technology/getting-meta-about-metadata-connecting-content-to-business-transactions-part-1/)



(*See* https://www.youtube.com/watch?v=9lXTgjAsiWc, at 0:46)

78.    Hyland's OnBase software provides a method for transmitting the content object, including the content and the object properties, to a content management server[1].

79.    As described above, Hyland's OnBase software selects at least one storage system from the plurality of storage systems on which to store the content object based on the content object type. For example, the imported document can be stored in a folder corresponding to the Document Type provided by the user. [2]

80.    Hyland's OnBase software provides a method in which the OnBase server associates the object properties, including a retention schedule, with the content file. This association is demonstrated at least by the fact that, as documents enter OnBase, they are automatically assigned unique retention requirements.[3]

81.    In addition, Hyland's OnBase software can also support automatic indexing that can then trigger retention rules.

---

[1] https://blog.hyland.com/hyland-technology/getting-meta-about-metadata-connecting-content-to-business-transactions-part-1/
[2] https://www.youtube.com/watch?v=9lXTgjAsiWc
[3] https://www.onbase.com/en/product/platform-capabilities/enterprise-content-management/onbase-ecm-functionality/records-management

COMPLAINT FOR PATENT INFRINGEMENT

■ **Saves time and supports compliance with automatic indexing**
With an automated solution, data fields can be selected to automatically serve as index fields in the ECM system, eliminating the need for staff to manually key in this information. These metadata fields can then trigger records management and retention rules, ensuring compliance with industry regulations, while also improving search and discovery.

(*See* https://www.hyland.com/-/media/Files/hyland/whitepaper/OnBase-aiim-turning-documents-into-data-whitepaper.pdf?la=en)

82.    Hyland's OnBase server determines a plugin configured to communicate with the selected storage system. For example, Hyland's OnBase software uses application add-ins and APIs to connect user's "data and systems enterprise-wide."

Hyland provides a suite of integration products that connect with your data and systems enterprise-wide, enabling you organization to surface and deliver critical content in context.

Our integration toolbox includes a variety of methods to connect your systems – from traditional tools like screen-scraping and application add-ins to APIs and tools that fit a more modern architecture like RESTful web services.

Most integration options are point-and-click configurable, allowing organizations to rapidly connect applications according to solution requirements.

Hyland's ECM integration abilities enable organizations to create solutions that:

- Provide users with access to complete, up-to-date information directly from the core applications they use every day
- Improve decision-making by elevating content visibility
- Derive more value from existing systems

(*See* https://www.hyland.com/en/platform/integrations)

83.    Hyland's OnBase software also uses API to connect with different archiving and storage solutions, such as Centera.

COMPLAINT FOR PATENT INFRINGEMENT



(*See*https://www.ibm.com/services/weblectures/dlv/partnerworld/online/ltu28129/mod%207%20ibm%20system%20storage%20archive%20and%20data%20retention%20systems%20v1.2.ppt)

84.   Hyland's OnBase server transmits the content and object properties to the selected storage system through the determined plugin, wherein the determined plugin comprises specific application program interfaces to the selected storage system[4].

85.   Hyland's OnBase software is configured to allow the object properties to be set, including the retention period to be defined, such that they are stored on the selected storage system.[5]

86.   Hyland's OnBase software stores the object properties, including the retention period, in a relational database:

---

[4] https://www.hyland.com/en/platform/integrations; see also https://www.youtube.com/watch?v=9lXTgjAsiWc and https://www.ibm.com/services/weblectures/dlv/partnerworld/online/ltu28129/mod%207%20ibm%20system%20storage%20archive%20and%20data%20retention%20systems%20v1.2.ppt
[5] https://www.onbase.com/en/product/platform-capabilities/enterprise-content-management/onbase-ecm-functionality/records-management

COMPLAINT FOR PATENT INFRINGEMENT

### 1. Keep OnBase Running Quickly

OnBase uses a proprietary database schema containing many interrelated tables. While it is a relational database, like most SQL databases, the relationships between each table are controlled by the OnBase Software, rather than by standard SQL Server functions and stored procedures. When updating or retrieving from tables, OnBase relies on its table Indexes to a greater extent than most other SQL Databases. Because of this, **it is vitally important that OnBase Indexes and Statistics are kept up to date.** This is particularly true of tables such as itemdata & itemdatapage, (which relate to the retrieval of the individual documents), the various Workflow tables (which keep track of a document or object's path through the Workflow Life Cycles and Queues), and Keyword tables (which keep track of the keyword metadata associated with each particular document). If your index statistics become out of date, which they can do very quickly in a heavily used system, SQL Server will resort to a full table scan, looking through every row of the table, rather than following the Indexed "shortcuts" to get to the desired document or keyword more quickly. Therefore, the following recommendation should always be followed: **update your Statistics and Indexes regularly, and ALWAYS update statistics at 100% sample.** Doing so will keep your SQL queries running quickly, and let your users work more efficiently!

(*See* https://www.keymarkinc.com/basic-onbase-database-maintenance-sql-server/)

87.    Each claim in the '726 patent recites an independent invention. Neither claim 1, described above, nor any other individual claim is representative of all claims in the '726 patent.

88.    Hyland been aware of the '726 patent since at least the filing and/or service of this Complaint. Further, OpenText marks its products with the '726 patent.

89.    Hyland actively induced and is actively inducing infringement of at least claim 1 of the '726 patent with specific intent to induce infringement, and/or willful blindness to the possibility that its acts induce infringement, in violation of 35 U.S.C. § 271(b), by activities relating to selling, marketing, advertising, promotion, support, and distribution of its OnBase platform in the United States.

90.    Hyland encourages, instructs, directs, and/or requires third parties— including its partners, customers, and/or end users—to use the infringing OnBase platform, as described above.

91.    Hyland's partners, customers, and end users of its OnBase platform directly infringe at least claim 1 of the '726 patent, at least by using the accused OnBase platform, as described above.

92.    For example, on information and belief, Hyland shares instructions, guides, and manuals, including through its website, training programs, and/or YouTube, which advertise and instruct third parties on how to use the OnBase platform in the manner described above, including at least Hyland's customers. On further information

and belief, Hyland provides customer service or technical support to purchasers of the infringing OnBase platform, which directs and encourages customers to use the OnBase platform in an infringing manner.

93.     For past infringement, OpenText has suffered damages, including lost profits, as a result of Defendant's infringement of the '726 patent. Defendant is therefore liable to OpenText under 35 U.S.C. § 284 for past damages in an amount that adequately compensates OpenText for Defendant's infringement, but no less than a reasonable royalty.

94.     For ongoing and future infringement, OpenText will continue to suffer irreparable harm unless this Court preliminarily and permanently enjoins Defendant, its agents, employees, representatives, and all others acting in concert with Defendant from infringing the '726 patent. In the alternative, OpenText is entitled to damages in lieu of an injunction, in an amount consistent with the facts, for future infringement. Defendant's continued infringement, at least since it had notice of the '726 patent, is knowing and willful. Defendant will be an adjudicated infringer of a valid patent and, thus, Defendant's future infringement will be willful as a matter of law.

95.     Hyland's infringement is without license or other authorization.

96.     This case is exceptional, entitling Plaintiff to enhanced damages under 35 U.S.C. § 284 and an award of attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## SECOND CAUSE OF ACTION
### (INFRINGEMENT OF THE '059 PATENT)

97.     OpenText realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

98.     Hyland has infringed and continues to infringe one or more claims of the '059 patent in violation of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States and will continue to do so unless enjoined by this Court. Hyland directly infringes at least claim 1 of the '059 patent by making, using, selling, and/or offering to

sell at least the accused OnBase EIM platform and integrated applications, including at least its Brainware software.

99.    For example, claim 1 of the '059 patent recites:

1. A method for automatically creating a model of documents representing a class of documents, the method comprising the steps of:

a)    providing a plurality of documents separated into different classes and selecting a first document from the plurality of documents, the first document belonging to a first class;

b)    determining at least one potential identifying tag within the first document, said identifying tag being defined by at least a graphical content, a size and a location within the first document

c)    correlating the at least one potential identifying tag within the first document with at least one potential identifying tag from a second document of the same first class as the first document, the second document selected from the plurality of documents; and

d)    creating a model of documents related to the first class, wherein the model includes the at least one potential identifying tag within the first document having a correlation that is representative of the first class.

100.   Hyland encourages customers to use its Brainware software in a way that infringes each limitation of at least claim 1 of the '059 patent at least by selling and offering to sell the infringing software, making its content services available on its website, providing applications that allow users to access those services, widely advertising those services, and providing technical support and instructions to users.

101.   Hyland's Brainware software provides a method for automatically creating a model of documents representing a class of documents. For example, Hyland's Brainware includes Intelligent Document Classification service that can automatically classify different classes of documents.



(*See* https://www.hyland.com/-/media/Hyland/brainware/product-overview/brainware-intelligent-capture-product-overview-17.pdf?la=en)



Brainware Intelligent Capture significantly reduces manual intervention with automated classification technology. It automatically classifies scanned documents based on their content, extracts key fields for indexing and then moves the documents into the appropriate workflow and archive or DMS.

Brainware Intelligent Capture integrates intelligent recognition into the front end at the point of scanning — automatically distinguishing between checks, invoices, orders and other forms of mail — and processing the items according to your predefined business rules.

(*See* https://www.hyland.com/en/platform/product-suite/brainware/intelligent-document-classification)

102.   75.     In addition, Hyland's Brainware can also be used to manage medical records, where medical records are automatically classified based at least in part on pattern recognition:

**INTELLIGENT CAPTURE AND CLASSIFICATION AUTOMATE KEY DIGITIZATION STEPS**

Luckily, intelligent data capture and document classification solutions are available to help automate many of the manual steps that can bog down the digitization process. Modern intelligent data capture solutions can capture, process and transform virtually any type of paper-based or digital document into useful and actionable information. By leveraging pattern-based recognition algorithms, these systems can learn from multiple data sets to continuously improve their accuracy and performance.

Intelligent data capture and extraction can be used to streamline the indexing process by automatically populating key indexing fields. Similarly, intelligent document classification technology helps automate the process of identifying and categorizing key document types. These solutions use optical character recognition (OCR) and pattern-based logic to automatically classify medical documents by identifying the key content characteristics (e.g. keywords, semantics, document layout, etc.). Any documents that can't be confidently identified by the software are placed in a folder for manual exception processing.

(*See* https://www.hyland.com/-/media/Hyland/hyland-healthcare/hc_whitepaper_medical-records-classification.pdf)

103.   Hyland's Brainware software provides a method for providing a plurality of documents separated into different classes and selecting a first document from the plurality of documents and the first document belonging to a first class. For example, Hyland's Brainware generalizes and applies a classification model that is developed based on a set of training documents in the same class.

COMPLAINT FOR PATENT INFRINGEMENT

**EXCEPTIONAL LEVELS OF AUTOMATION WITH HUMAN-LIKE INTELLIGENCE**

Brainware intelligence facilitates higher accuracy in document classification and data extraction, driving automation and reducing human touch points.

**Seeing patterns**

Without reading the document, Brainware can see patterns to determine where the important information lies. Similar to viewing a document with blurry vision, without seeing individual letters and words, it can recognize clusters of tabular data and focus on those areas for extraction.

The technology can determine where information exists within a table, so that no matter how large that table is or how many times the table is repeated across pages, the software can easily find, identify and correctly extract information.

**Learning and applying**

The software only needs to see a small set of examples to understand how to classify that particular document type. With that, it can generalize and apply that classification to many variations by looking at word occurrence, colors and space on a page as well as images.

In addition, the software can learn from historical and real-time data corrections and manual data entry to improve its ability to capture information accurately. With real-time correction, it notices where staff are pulling specific data points — and where they are not — to learn context for the future.

(*See* https://www.hyland.com/-/media/Hyland/brainware/product-overview/brainware-intelligent-capture-product-overview-17.pdf?la=en)

104.   Hyland's Brainware software provides a method for determining at least one potential identifying tag within the first document, and the identifying tag is defined by at least a graphical content, a size and a location within the first document. For example, Hyland's Brainware software can classify documents based on word occurrence, colors and space on a page as well as images:

COMPLAINT FOR PATENT INFRINGEMENT

**EXCEPTIONAL LEVELS OF AUTOMATION WITH HUMAN-LIKE INTELLIGENCE**

Brainware intelligence facilitates higher accuracy in document classification and data extraction, driving automation and reducing human touch points.

**Seeing patterns**

Without reading the document, Brainware can see patterns to determine where the important information lies. Similar to viewing a document with blurry vision, without seeing individual letters and words, it can recognize clusters of tabular data and focus on those areas for extraction.

The technology can determine where information exists within a table, so that no matter how large that table is or how many times the table is repeated across pages, the software can easily find, identify and correctly extract information.

**Learning and applying**

The software only needs to see a small set of examples to understand how to classify that particular document type. With that, it can generalize and apply that classification to many variations by looking at word occurrence, colors and space on a page as well as images.

(*See* https://www.hyland.com/-/media/new-brand/pdfs/brochure/product-overview-brainware.pdf)

## Step 2: Classification & Data Capture

Document images can also be automatically identified, sorted and routed to the appropriate person, department, or network location, by applying a variety of classification techniques. This includes utilizing the physical attributes of a document image, matching to a library of images or even "reading" the document to determine its content. For example, documents less than four inches in height can be determined to be checks, invoices can be matched to known vendor logo images, or the data on the document itself can identify it, such as the word "invoice." This ability to classify incoming documents reduces the need for clerical or mailroom staff to manually sort the documents before processing.

Document recognition and classification also eliminates the need to use patch pages, removing another hidden cost. Patch pages are a common document preparation technique that involves an operator physically inserting a blank page wherever document separation is needed. A classification solution easily eliminates this step because it identifies where separation is needed and routes document sets accordingly.

(*See* https://www.hyland.com/-/media/Files/hyland/whitepaper/OnBase-aiim-turning-documents-into-data-whitepaper.pdf?la=en)

105.   Hyland's Brainware software provides a method for correlating the at least one potential identifying tag within the first document with at least one potential identifying tag from a second document of the same first class as the first document. For example, Hyland's Brainware is capable of matching a document image with other images to perform classification and understanding document variance by comparison.

COMPLAINT FOR PATENT INFRINGEMENT

## Step 2: Classification & Data Capture

Document images can also be automatically identified, sorted and routed to the appropriate person, department, or network location, by applying a variety of classification techniques. This includes utilizing the physical attributes of a document image, matching to a library of images or even "reading" the document to determine its content. For example, documents less than four inches in height can be determined to be checks, invoices can be matched to known vendor logo images, or the data on the document itself can identify it, such as the word "invoice." This ability to classify incoming documents reduces the need for clerical or mailroom staff to manually sort the documents before processing.

Document recognition and classification also eliminates the need to use patch pages, removing another hidden cost. Patch pages are a common document preparation technique that involves an operator physically inserting a blank page wherever document separation is needed. A classification solution easily eliminates this step because it identifies where separation is needed and routes document sets accordingly.

(*See* https://www.hyland.com/-/media/Files/hyland/whitepaper/OnBase-aiim-turning-documents-into-data-whitepaper.pdf?la=en)

**EXCEPTIONAL LEVELS OF AUTOMATION WITH HUMAN-LIKE INTELLIGENCE**

Brainware Intelligence facilitates higher accuracy in document classification and data extraction, driving automation and reducing human touch points.

**Seeing patterns**

Without reading the document, Brainware can see patterns to determine where the important information lies. Similar to viewing a document with blurry vision, without seeing individual letters and words, it can recognize clusters of tabular data and focus on those areas for extraction.

The technology can determine where information exists within a table, so that no matter how large that table is or how many times the table is repeated across pages, the software can easily find, identify and correctly extract information.

**Learning and applying**

The software only needs to see a small set of examples to understand how to classify that particular document type. With that, it can generalize and apply that classification to many variations by looking at word occurrence, colors and space on a page as well as images.

In addition, the software can learn from historical and real-time data corrections and manual data entry to improve its ability to capture information accurately. With real-time correction, it notices where staff are pulling specific data points — and where they are not — to learn context for the future.

**Understanding variance**

"Watching" staff make data corrections, while other products memorize the exact information and specific coordinates on the page, Brainware can generalize and apply what it learned, even as formats change or information shifts on the page.

Working directly with other systems and databases, Brainware can understand when information is misspelled or changed and still match the new with existing information. It can deduce near matches by performing comparisons, which helps to validate pulled data as well as automatically populate additional fields with related information from the other systems.

**Humans behind the humanizing**

Hyland employs PhD scientists with backgrounds in neuroscience, physics and engineering to enhance the intelligence within Brainware. They leverage expert knowledge of the human brain and sensory processing, and have over 15 years of software development experience to develop the algorithms behind Brainware.

**BUILT BY A RECOGNIZED INDUSTRY LEADER**

Hyland, the developer of Brainware, has over 25 years' experience building content solutions for businesses of all sizes across the globe. Hyland has been recognized as a leader in the industry by top analyst firms and offers an extensive array of content services, including capture technology, content management and workflow automation. Brainware can be leveraged alongside these other offerings to create a complete business content solution.

(See https://www.hyland.com/-/media/Hyland/brainware/product-overview/brainware-intelligent-capture-product-overview-17.pdf?la=en)

106.   Hyland's Brainware software provides a method for creating a model of documents related to the first class, and the model includes the at least one potential identifying tag within the first document having a correlation that is representative of the first class. For example, Hyland's Brainware can apply the classification developed from the small set of training documents to many variations.

COMPLAINT FOR PATENT INFRINGEMENT

**EXCEPTIONAL LEVELS OF AUTOMATION WITH HUMAN-LIKE INTELLIGENCE**

Brainware intelligence facilitates higher accuracy in document classification and data extraction, driving automation and reducing human touch points.

**Seeing patterns**

Without reading the document, Brainware can see patterns to determine where the important information lies. Similar to viewing a document with blurry vision, without seeing individual letters and words, it can recognize clusters of tabular data and focus on those areas for extraction.

The technology can determine where information exists within a table, so that no matter how large that table is or how many times the table is repeated across pages, the software can easily find, identify and correctly extract information.

**Learning and applying**

The software only needs to see a small set of examples to understand how to classify that particular document type. With that, it can generalize and apply that classification to many variations by looking at word occurrence, colors and space on a page as well as images.

In addition, the software can learn from historical and real-time data corrections and manual data entry to improve its ability to capture information accurately. With real-time correction, it notices where staff are pulling specific data points — and where they are not — to learn context for the future.

(*See* https://www.hyland.com/-/media/Hyland/brainware/product-overview/brainware-intelligent-capture-product-overview-17.pdf?la=en)

**PROVIDES CONSISTENT DOCUMENT TYPE CLASSIFICATION**

It doesn't matter how medical record documents enter OnBase — they may be imported by fax, through a sweep or uploaded at a centralized scanning center. Once in the system, Intelligent MedRecords scans each document and, using optical character recognition, "reads" the information. Based on a series of pre-defined rules and pattern-based recognition algorithms, Brainware uses keywords, semantics, document layout and more to automatically classify and assign a document type. If the solution is unable to classify a document, or if it recognizes multiple classifications, it routes the exception for manual review within OnBase. The solution presents all information for verification by HIM staff before exporting documents to the EMR. Hyland also offers Intelligent MedRecords Validated which includes the automatic document classification technology and Hyland medical record validation services. If you wish to have Hyland manage the entire process including scanning of documents and the classification and validation of medical records, simply select our full service Intelligent MedRecords Delivered solution.

**MANAGES HIGH VOLUMES OF DIVERSE DOCUMENT FORMATS**

The HIM department is responsible for maintaining a healthcare organization's legal medical record. Consistent document type classification ensures the information that routes to the EMR is correct and assigned to the right patient — whether it's a patient's insurance card, a provider's progress notes or a surgical consent form. This accelerator solution is pre-configured to recognize more than 100 different document types, and as part of purchase, services engagement can map to additional existing document types for more customized capture.

(*See* https://www.hyland.com/-/media/new-brand/pdfs/solution-summary/hc_solution-overview_medical-records-classification.pdf?la=en)

COMPLAINT FOR PATENT INFRINGEMENT

107.   Each claim in the '059 patent recites an independent invention. Neither claim 1, described above, nor any other individual claim is representative of all claims in the '059 patent.

108.   Hyland has been aware of the '059 patent since at least the filing and/or service of this Complaint. Further, OpenText marks its products with the '059 patent.

109.   Hyland actively induced and is actively inducing infringement of at least claim 1 of the '059 patent with specific intent to induce infringement, and/or willful blindness to the possibility that its acts induce infringement, in violation of 35 U.S.C. § 271(b), by activities relating to selling, marketing, advertising, promotion, support, and distribution of its Brainware software in the United States.

110.   Hyland encourages, instructs, directs, and/or requires third parties—including its partners, customers, and/or end users—to use the infringing Brainware software, as described above.

111.   Hyland's partners, customers, and end users of its Brainware software directly infringe at least claim 1 of the '059 patent, at least by using the accused Brainware software, as described above.

112.   For example, on information and belief, Hyland shares instructions, guides, and manuals, including through its website, training programs, and/or YouTube, which advertise and instruct third parties on how to use the Brainware software in the manner described above, including at least Hyland's customers. On further information and belief, Hyland provides customer service or technical support to purchasers of the infringing Brainware software, which directs and encourages customers to use the Brainware software in an infringing manner.

113.   For past infringement, OpenText has suffered damages, including lost profits, as a result of Defendant's infringement of the '059 patent. Defendant is therefore liable to OpenText under 35 U.S.C. § 284 for past damages in an amount that adequately compensates OpenText for Defendant's infringement, but no less than a reasonable royalty.

114. For ongoing and future infringement, OpenText will continue to suffer irreparable harm unless this Court preliminarily and permanently enjoins Defendant, its agents, employees, representatives, and all others acting in concert with Defendant from infringing the '059 patent. In the alternative, OpenText is entitled to damages in lieu of an injunction, in an amount consistent with the facts, for future infringement. Defendant's continued infringement, at least since it had notice of the '059 patent, is knowing and willful. Defendant will be an adjudicated infringer of a valid patent and, thus, Defendant's future infringement will be willful as a matter of law.

115. Hyland's infringement is without license or other authorization.

116. This case is exceptional, entitling Plaintiff to enhanced damages under 35 U.S.C. § 284 and an award of attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## THIRD CAUSE OF ACTION

### (INFRINGEMENT OF THE '980 PATENT)

117. OpenText realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

118. Hyland has infringed and continues to infringe one or more claims of the '980 patent in violation of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States and will continue to do so unless enjoined by this Court. Hyland directly infringes at least claim 1 of the '980 patent by making, using, selling, and/or offering to sell its accused EIM platform, including at least Hyland's Perceptive Content ECM platform.

119. For example, claim 1 of the '980 patent recites:

1. A method of managing content, comprising:

receiving an indication that a retention policy is to be applied to a selected item of content comprising a body of managed content, wherein the selected item of content is stored in a content store; and

automatically retaining the selected item of content and its associated metadata in parallel in accordance with the retention policy, wherein the associated metadata is stored in a metadata store and wherein automatically retaining in the selected item of content and its associated metadata in parallel comprises applying the retention policy both to the selected item of content and to its associated metadata;

receiving a hold request to be placed for the selected item of content for a hold period, wherein placing a hold on a content comprises ensuring the content is retained in a prescribed location during a hold period and preventing the content from being changed; and

in the event: 1) an expiry notification is received that an applicable retention period of the retention policy has ended for the associated metadata, and 2) a disposal notification is received that the associated metadata is to be disposed,

using a processor to prevent the associated metadata from being disposed otherwise permitted by the expiry notification of the associated metadata, based in part on the hold period of the selected item of content.

120.   Hyland encourages customers to use its EIM platform in a way that infringes each limitation of at least claim 1 of the '980 patent at least by selling and offering to sell the infringing software, making its content services available on its website, providing applications that allow users to access those services, widely advertising those services, and providing technical support and instruction to users.

121.   To the extent the preamble is construed to be limiting, Hyland's Perceptive Content ECM platform provides a method of managing content.[6]

---

[6] https://www.hyland.com/en/platform/product-suite/perceptive-content?_ga=2.221832542.716803127.1604003993-1023628431.1602119535

1
2
3
4
5
6
7
8
9
10
11
12
13
14

**OVERVIEW**

**The Perceptive Content platform**

Perceptive Content is a scalable content services platform that manages the entire content lifecycle, from capture to disposition. Flexible functionality across multiple business applications, integration with virtually any business application and a simple-to-use interface help Perceptive Content transform internal processes and the customer experience.

Perceptive Content helps users work smarter by surfacing content in context with other relevant business information. Digital documents can be viewed simultaneously, which promotes enhanced collaboration and communication among employees, customers and vendors. Locating relevant documents in the context of a business process increases customer satisfaction and employee productivity. Automated lifecycle management helps organizations comply with their records and retention policies, which reduces the risk of compliance violations and resulting fees and fines.

15   https://www.hyland.com/-/media/new-brand/pdfs/solution-summary/Perceptive-
16   Content_solution-summary_final.pdf

17      122.   Hyland's Perceptive Content platform provides a method for managing

18   content that involves receiving an indication that a retention policy is to be applied to a

19   selected item of content comprising a body of managed content. For example, Hyland's

20   Perceptive Content platform includes records and information management ("RIM"),[7]

21   providing a "Perceptive Retention Policy Manager" which can "easily create powerful,

22   time-based, event-based, and time-and-event-based retention policies using ordinary

23   language to define rules."[8] The "Policy Designer" "allows retention policies to be

24   applied directly to the document type, ensuring all new documents captured into the

25   system fall instantly under the correct policy." The platform receives the user's

26

27   _____
     [7] https://www.hyland.com/-/media/Hyland/resources/product-summary/hyland-product-summary-Perceptive-Content-
     3481-final.pdf?la=en&hash=016655DE758155ABBEE54487CEA21294CBD59E1B
28   [8] https://apps.des.wa.gov/contracting/ECMRequirementsComparisonofStateVendors.pdf

indication via the policy designer that the policy should be applied to documents in the repository.[9]

123. Hyland's Perceptive Content platform provides a method for managing content, including automatically retaining the selected record and its associated metadata in parallel in accordance with the retention policy wherein the retention policy is applied to both the record and its associated metadata. For example, upon storage of the record, the metadata is stored in a Perceptive Content database.[10] Users can create simple or complex "retention policies" configured to automatically transfer, destroy or permanently retain documents according to the business or legal requirements.[11]

### What are documents and projects?

ImageNow stores and organizes files as one of the following information types:

- **Documents** – A document is a set of scanned images or imported files or both, along with the metadata (such as index keys) that make it easy to search for the document. A document can contain many different file formats. TIFF, DOCX, and PNG are just a few of the accepted file types. A document appears in ImageNow Viewer or WebNow Viewer.

- **Projects** – Projects group related documents independently of the index keys assigned to them.

http://helpdesk.cwsl.edu/Software/ImageNow/ImageNow_GettingStarted_6.6.pdf

---

[9] *Id.*
[10] http://docplayer.net/56017442-Emc-centera-advanced-design-and-setup-guide-perceptive-content-version-7-0-x.html
[11] https://apps.des.wa.gov/contracting/ECMRequirementsComparisonofStateVendors.pdf

COMPLAINT FOR PATENT INFRINGEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15



16   http://docplayer.net/56017442-Emc-centera-advanced-design-and-setup-guide-
17   perceptive-content-version-7-0-x.html

18       124.   The retention policy may be applied both to the selected item of content

19   and to its associated metadata. For example, only upon the expiration of the retention

20   policy does the Retention Policy Manger "remove[ ] the document pages, metadata, or

21   both, depending on the disposition action."[12]

22       125.  Hyland's Perceptive Content platform provides a method including

23   receiving a hold request to be applied to selected records or documents for a hold period,

24   wherein placing a hold on a record ensures the record is retained in a prescribed location

25   during the hold period and preventing the record from being changed. For example,

26   Hyland's records management allows a user to apply secure legal or audit holds to

27

28     [12] *Id.*

COMPLAINT FOR PATENT INFRINGEMENT

prevent modification or deletion of a record.

**Litigation and audit holds**

• Easily search and apply holds to prevent modification or deletion even if the retention period has expired

• Export information on hold in PDF, TIFF or native format for external review or discovery

https://www.hyland.com/-/media/Files/hyland/article/hyland-product-summary-retention-policy-manager.pdf?la=en

- Applying Holds - Retention Policy Manager provides multiple methods for applying holds to relevant documents, based upon your unique business requirements. Holds suspend the disposition of a document and protect that document from modification or manual deletion.

- Users with the "Apply Document Hold" privilege can apply or remove direct holds to individual documents from the Explorer window or various viewers within the solution. You can search for relevant documents and select only the documents you need and quickly apply the hold. Holds can also be applied at the Document Type level via Retention Policy Manager. You can apply multiple holds to the same document. The document remains on hold until all applied holds are removed. When you view a document on hold in the Document Viewer, an icon appears on the status bar denoting that it is on hold.

- If needed, Retention Policy Manager can be configured to allow an authorized user to modify document keys and custom properties after a document is placed on hold.

https://apps.des.wa.gov/contracting/ECMRequirementsComparisonofStateVendors.pdf

126.   In particular, the initiation of a hold will prevent modification or deletion even if the retention period has expired.[13] "Such information is on hold indefinitely and cannot be modified or deleted until the hold is removed." That is, the relevant information will be preserved "until notification that the hold can be lifted is received":

---

[13] https://www.hyland.com/-/media/Files/hyland/article/hyland-product-summary-retention-policy-manager.pdf?la=en

COMPLAINT FOR PATENT INFRINGEMENT

**User scenario**

1. The records manager of ABC, Inc. sets up a retention policy that automatically preserves employment applications for two years, then destroys them.

2. As part of their normal routine, ABC Human Resources captures employment applications in Perceptive Content. Automatic indexing places these documents under the appropriate retention policy, based on the document type.

3. An applicant who does not get hired at ABC, Inc. feels the decision was a result of discrimination, and the HR department has been notified that a lawsuit is possible. In response to this information, the records manager places all of the applicant's information in Perceptive Content on hold, preserving relevant information until notification that the hold can be lifted is received. Such information is on hold indefinitely and cannot be modified or deleted until the hold is removed.

Thus, in the event that an expiry notification is received that an applicable retention period of the retention policy has ended for the associated metadata, and a disposal notification is received that the associated metadata is to be disposed, Hyland's Perceptive Content platform uses a processor to prevent the associated metadata from being disposed of based, in part, on the hold period of the selected record.

127.   Each claim in the '980 patent recites an independent invention. Neither claim 1, described above, nor any other individual claim is representative of all claims in the '980 patent.

128.   Hyland has been aware of the '980 patent since at least the filing and/or service of this Complaint. OpenText marks its products with the '980 patent.

129.   Hyland actively induced and is actively inducing infringement of at least claim 1 of the '980 patent with specific intent to induce infringement, and/or willful blindness to the possibility that its acts induce infringement, in violation of 35 U.S.C. § 271(b), by activities relating to selling, marketing, advertising, promotion, support, and distribution of its EIM platform in the United States.

130.   Hyland encourages, instructs, directs, and/or requires third parties— including its partners, customers, and/or end users—to use the infringing EIM platform, as described above.

131.   Hyland's partners, customers, and end users of its EIM platform directly infringe at least claim 1 of the '980 patent, at least by using the accused EIM platform, as described above.

132.   For example, on information and belief, Hyland shares instructions, guides, and/or manuals, including through its website, training programs, and/or YouTube, which advertise and instruct third parties on how to use the EIM platform to store content in accordance with a retention policy, as described above, including at least customers and partners. On further information and belief, Hyland also provides customer service, training, instruction, and/or technical support to purchasers of the infringing EIM platform, which directs and encourages customers to use the EIM platform in an infringing manner.

133.   For past infringement, OpenText has suffered damages, including lost profits, as a result of Defendant's infringement of the '980 patent. Defendant is therefore liable to OpenText under 35 U.S.C. § 284 for past damages in an amount that adequately compensates OpenText for Defendant's infringement, but no less than a reasonable royalty.

134.   For ongoing and future infringement, OpenText will continue to suffer irreparable harm unless this Court preliminarily and permanently enjoins Defendant, its agents, employees, representatives, and all others acting in concert with Defendant from infringing the '980 patent. In the alternative, OpenText is entitled to damages in lieu of an injunction, in an amount consistent with future infringement. Defendant's continued infringement, at least since it had notice of the '980 patent, is knowing and willful. Defendant will be adjudicated infringers of a valid patent, and thus Defendant's future infringement will be willful as a matter of law.

135.   Hyland's infringement is without license or other authorization.

136.   This case is exceptional, entitling Plaintiff to enhanced damages under 35 U.S.C. § 284 and an award of attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

# FOURTH CAUSE OF ACTION

## (INFRINGEMENT OF THE '907 PATENT)

137.   OpenText realleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint.

138.   Hyland has infringed and continues to infringe one or more claims of the '907 patent in violation of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States and will continue to do so unless enjoined by this Court. Hyland directly infringes at least claim 8 of the '907 patent by making, using, selling, and/or offering to sell at least the accused Hyland Brainware and OnBase software. Hyland's Brainware and OnBase include, without limitation, Advanced Capture capabilities (hereafter "Advanced Capture") that provide template-based classification of documents.

139.   For example, claim 8 of the '907 patent recites:

8. A method comprising:

creating and storing a plurality of templates associated with a plurality of document classes, each template comprising a plurality of keywords;

receiving a digitized document to be classified;

comparing each template with the digitized document to be classified, wherein the comparison comprises:

comparing a first area value associated with a template with a second area value associated with the digitized document,

the first area value associated with a keyword indicating an area occupied by the keyword in the template, and

the second area value that indicates an area occupied by a word in the digitized document to be classified;

determine that a difference between the first and second area values is below a threshold value; and

upon the determination that a difference is below a threshold value, identify the keyword as being a keyword for a word pair, and identify the word

1  in the digitized document to be classified as being a corresponding word for the

2  word pair.

3  140.  Hyland encourages customers to use its Advanced Capture in a way that

4  infringes each limitation of claim 8 of the '907 patent at least by selling and offering to

5  sell the infringing software, making its services available on its website, providing

6  applications that allow users to access those services, widely advertising those services,

7  and providing technical support and instruction to users.

8  141.  Hyland's Advanced Capture provides a method for creating and storing a

9  plurality of templates associated with a plurality of document classes, and each template

10  comprises a plurality of keywords. For example, Hyland's Advanced Capture is capable

11  of template-based classification and the template used in the classification includes

12  keywords.

> **Advanced Capture** provides template-based classification and extraction for structured and semi-structured documents of any type. **Intelligent Capture for AP** provides simpler invoice capture with header-type information, when line-item detail is not required. **OCR for AnyDoc** is available for automated capture within existing AnyDoc solutions and for specific healthcare forms capture.

   

(*See* https://www.governmentecmsolutions.com/files/127868480.pdf)



(*See* https://training.hyland.com/courses/P1805-Advanced-Capture-Hands-On-Lab)

142.   Hyland's Advanced Capture provides a method for receiving a digitized document to be classified. On information and belief, Hyland's Advanced Capture receives a digitized document before performing classification over the document.

143.   Hyland's Advanced Capture provides a method for comparing each template with the digitized document to be classified, wherein the comparison includes comparing a first area value associated with a template with a second area value associated with the digitized document, the first area value associated with a keyword indicating an area occupied by the keyword in the template, and the second area value that indicates an area occupied by a word in the digitized document to be classified. For example, Hyland's Advanced Capture uses a template including a plurality of identification zones, each of which is characterized by its location, size (e.g., larger than the text inside the zone), and content within the zone. Hyland's Advanced Capture compares the contents within the identification zones of the document to be classified with contents in the corresponding identification zones of a template.

## Advanced Capture templates

- Fixed location
- Floating data (tags)
- Data composition – Regular Expression
- Columns and rows of data – integrity
- Reports with header/footer & record sets

(*See* https://studylib.net/doc/5523572/advanced-capture)



(*See* https://www.youtube.com/watch?v=pzU48RNUG34 at 10:45)

144.   Hyland's Advanced Capture provides a method for determining that a difference between the first and second area values is below a threshold value, and upon the determination that a difference is below a threshold value, identifying the keyword as being a keyword for a word pair, and identifying the word in the digitized document to be classified as being a corresponding word for the word pair. As described above, Hyland's Advanced Capture compares the contents within the identification zones with contents in corresponding identification zones of a template. On information and belief, Hyland's Advanced Capture determines that the keyword is a keyword for a word pair and identifies the word in the document to be classified as a corresponding word for the

word pair.[14]

145.   Each claim in the '907 patent recites an independent invention. Neither claim 8, described above, nor any other individual claim is representative of all claims in the '907 patent.

146.   Hyland has been aware of the '907 patent since at least the filing and/or service of this Complaint. OpenText marks its products with the '907 patent.

147.   Hyland actively induced and is actively inducing infringement of at least claim 8 of the '907 patent with specific intent to induce infringement, and/or willful blindness to the possibility that its acts induce infringement, in violation of 35 U.S.C. § 271(b), by activities relating to selling, marketing, advertising, promotion, support, and distribution of its Brainware and OnBase systems in the United States.

148.   Hyland encourages, instructs, directs, and/or requires third parties—including its partners, customers, and/or end users—to use the infringing Brainware and OnBase software, as described above.

149.   Hyland's partners, customers, and end users of its Brainware and OnBase software directly infringe at least claim 8 of the '907 patent, at least by using the accused Brainware and OnBase software, as described above.

150.   For example, on information and belief, Hyland shares instructions, guides, and/or manuals, including through its website, training programs, and/or YouTube, which advertise and instruct third parties on how to use the Brainware and OnBase software to classify documents, as described above. On further information and belief, Hyland also provides customer service, training, instruction, and/or technical support to purchasers of the infringing Brainware and OnBase software, which directs and encourages customers to use the Brainware and OnBase software in an infringing manner.

151.   For past infringement, OpenText has suffered damages, including lost

---

[14] https://www.youtube.com/watch?v=pzU48RNUG34

profits, as a result of Defendant's infringement of the '907 patent. Defendant is therefore liable to OpenText under 35 U.S.C. § 284 for past damages in an amount that adequately compensates OpenText for Defendant's infringement, but no less than a reasonable royalty.

152.   For ongoing and future infringement, OpenText will continue to suffer irreparable harm unless this Court preliminarily and permanently enjoins Defendant, its agents, employees, representatives, and all others acting in concert with Defendant from infringing the '907 patent. In the alternative, OpenText is entitled to damages in lieu of an injunction, in an amount consistent with future infringement. Defendant's continued infringement, at least since it had notice of the '907 patent, is knowing and willful. Defendant will be adjudicated infringers of a valid patent, and thus Defendant's future infringement will be willful as a matter of law.

153.   Hyland's infringement is without license or other authorization.

154.   This case is exceptional, entitling Plaintiff to enhanced damages under 35 U.S.C. § 284 and an award of attorneys' fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

/ /

/ /

## **PRAYER FOR RELIEF**

WHEREFORE, OpenText respectfully requests the following relief:

a)   That this Court adjudge and decree that Defendant has been, and is currently, infringing each of the Patents-in-Suit;

b)   That this Court award damages to OpenText to compensate it for Defendant's past infringement of the Patents-in-Suit, through the date of trial in this action;

c)   That this Court award pre- and post-judgment interest on such damages to OpenText;

d)      That this Court order an accounting of damages incurred by OpenText from six years prior to the date this lawsuit was filed through the entry of a final, non-appealable judgment;

e)      That this Court determine that this patent infringement case is exceptional pursuant to 35 U.S.C. §§ 284 and 285 and award OpenText its costs and attorneys' fees incurred in this action;

f)      That this Court award increased damages under 35 U.S.C. § 284;

g)      That this Court preliminarily and permanently enjoin Defendant from infringing any of the Patents-in-Suit;

h)      That this Court order Defendant to:

(i)      recall and collect from all persons and entities that have purchased any and all products found to infringe any of the Patents-in-Suit that were made, offered for sale, sold, or otherwise distributed in the United States by Defendant or anyone acting on its behalf;

(ii) destroy or deliver to OpenText all such infringing products;

(iii) revoke all licenses to all such infringing products;

(iv) disable all web pages offering or advertising all such infringing products;

(v) destroy all other marketing materials relating to all such infringing products;

(vi) disable all applications providing access to all such infringing software; and

(vii) destroy all infringing software that exists on hosted systems;

i)      That this Court, if it declines to enjoin Defendant from infringing any of the Patents-in-Suit, award damages for future infringement in lieu of an injunction; and

j) That this award such other relief as the Court deems just and proper.

1    DATED:  November 2, 2020          KING & SPALDING LLP

2

3                                      By:  */s/Joseph N. Akrotirianakis*

4                                           Joseph N. Akrotirianakis
                                            Christopher C. Campbell (*pro hac vice* to

5                                           be filed)
                                            Britton F. Davis (*pro hac vice* to be filed)

6                                           Angela C. Tarasi (*pro hac vice* to be filed)
                                            Mikaela Stone (*pro hac vice* to be filed)

7

8                                           *Attorneys for Plaintiff* OPEN TEXT

9                                           CORPORATION

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PATENT INFRINGEMENT

1

**DEMAND FOR JURY TRIAL**

2

OpenText respectfully requests a trial by jury on all issues triable thereby.

3

DATED: November 2, 2020          KING & SPALDING LLP

4

5

By: */s/Joseph N. Akrotirianakis*

6

Joseph N. Akrotirianakis
Christopher C. Campbell (*pro hac vice* to

7

be filed)

8

Britton F. Davis (*pro hac vice* to be filed)
Angela C. Tarasi (*pro hac vice* to be filed)

9

Mikaela Stone (*pro hac vice* to be filed)

10

*Attorneys for Plaintiff* OPEN TEXT

11

CORPORATION

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR PATENT INFRINGEMENT